```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
                                      :
UNITED STATES OF AMERICA                        21 Cr. 650 (NSR)
                                      :
    - v. -
                                      :
AARON FINN.
                                      :
--------------------------------------X
                    SENTENCING MEMORANDUM
```

```
Dated:    White Plains, New York
          October 19, 2022

                              Federal Defenders of New York
                              Benjamin Gold
                              Attorney for Mr. Finn
                              81 Main Street
                              White Plains, NY  10601
                              (914) 458-8128


To:  Damian Williams
     United States Attorney
     Southern District of New York
     One St. Andrews's Place
     New York, New York
     Attn:  AUSA Lindsey Keenan and Charles Jacob
```

**Federal Defenders**
OF NEW YORK, INC.

Southern District
81 Main Street, Suite 300
White Plains, N.Y. 10601-4150
Tel: (914) 428-7124 Fax: (914) 948-5109

David E. Patton
*Executive Director
and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

Via e-mail and ECF

October 19, 2022

The Honorable Nelson S. Román
District Court Judge
Southern District of New York
300 Quarropas Street
White Plains, New York  10601-4150

    Re:    United States v. Aaron Finn
            21-CR-650 (NSR)

Dear Honorable Román:

When his parent's health was in decline, Aaron Finn (herein Mr. Finn) purchased a home so that they could move nearby and be taken care of. When his father-in-law died in Texas, Mr. Finn paid for the family's belongings to get to New York so that they would not be lost forever. And when his sister-in-law's car breaks down, Mr. Finn repairs it. Put simply, when family or friends need help – whether it be a car that needs to be fixed, gutters that need to be cleaned, or a heat pump that is malfunctioning – Mr. Finn is the one who will be there within minutes, no charge. While Mr. Finn undoubtedly broke the law when he attacked a handcuffed inmate, this was a seven-second aberration in an otherwise admirable, noble and selfless life. For these reasons, and as detailed below, I ask that Your Honor impose a non-incarceratory sentence.

### *Mr. Finn's Childhood*

Mr. Finn was born in 1986 in Poughkeepsie, New York. PSR ¶ 8. While Mr. Finn has older half siblings (one of whom passed away), his siblings are significantly older and had moved out of the familial home before Mr. Finn was born. PSR ¶ 33-34. Mr. Finn grew up poor. PSR ¶ 35. For a significant period of

his childhood, the family lived without electricity or running water – details Mr. Finn was told to hide from his neighbors and peers out of a fear that child protective services might disrupt the family. *Id*. As Mr. Finn got older and learned that his friends had electricity, Mr. Finn realized just how atypical his childhood was. *Id*. His meager upbringings yielded at least one benefit: at an early age, Mr. Finn learned significant "fix it" skills which allowed him to recycle other people's trash into usable items. *Id.*

Despite being poor, Mr. Finn was never homeless and always had food to eat. *Id.* Mr. Finn's father was distrustful of government: he feared social security numbers were being used to track people, so Mr. Finn did not get a social security number until he was sixteen. *Id*. School was difficult for Mr. Finn, perhaps because his ADHD had yet to be diagnosed. PSR ¶ 44, 48. Nevertheless, Mr. Finn did well in technological and mechanical classes and was able to graduate high school in 2005. PSR ¶ 48.

### *Mr. Finn's Adult Years: Service to Family and Friends*

At roughly twenty-two years' old, Mr. Finn began dating Amanda Belcher. PSR ¶ 37. The two married in 2013 and live in Hyde Park, New York. PSR P. 1, ¶ 37. Mr. Finn's parents struggle with health and mobility issues, so when the house across the street was put on the market, Mr. Finn liquidated his retirement funds so that he could purchase a home for his infirm parents to reside in. Amanda Finn Letter (Exhibit A), PSR ¶ 33. John Finn, Mr. Finn's father, suffers from a variety of health issues including ███████████████████████████████████████. PSR ¶ 33, John Finn Letter (attached as Exhibit B). He weighs 500 pounds and uses a wheelchair. PSR ¶ 33. Mr. Finn does not want his father in a nursing home, so he moved him to Hyde Park and now serves as his father's caretaker. PSR ¶ 33, Amanda Finn Letter (Exhibit A). Due to his father's weight and mobility issues, Mr. Finn invented a battery-operated device that enables his father to get into his wheelchair. *Id*. As detailed by his father's letter to Your Honor,

> I had a ███ 11 years ago and I found out I had ███ also.  After my stroke, I counted on A.J. to help me.  My physical mind is slow and he helps me with medical paperwork and helped me understand doctors questions.
>
> During this time A.J. was the only one on my side.  He took me to the doctors, Rx drug, and Physical Therapy.  He bought and rebuilt a house for my wife and I so it was all one level.  He built a bed for me so I can slide in with a handle to adjust myself.  He installed a handicap shower and added lots of handles, and a handicap toilet with handles.  Most of all he created a body lift because no one can lift me when I fall off the bed or wheelchair. . . Without his help I'll be in poor shape not being able to help my wife, his mother (80) and myself (68) and handicapped.  He supports us both physical and financially.
>
> John Finn Letter (Exhibit B).

Mr. Finn's mother shares a similar sentiment.  In her letter to Your Honor, she explains, "I would be so grateful if you could give Aaron Home Detention because we are dependent on his help to us.  I will celebrate my birthday on October 30th, it would be a great present for me."  Kay Finn Letter (Exhibit C).  *See* also Virginia Cline Letter (Exhibit D) ("When his mom and dad got ill and had a hard time managing their place AJ worked hard and found and bought them a place to live. . . He then took the place . . . made it handicap accessible for his mom and dad to get around"); Vincent Giaimo Letter (Exhibit E) ("He drives him around to his appointments, gets his father in and out of the car, the house and the doctor's office.  Aaron frequently shops for his parent's and takes care of pharmacy trips and chores for them"); Amanda Finn Letter (Exhibit A) ("My decision [to marry Aaron] was partly influenced by the recent care I had witnessed him offer his parents after his father's stroke even when his father is obstinate about letting people help them.  Aaron sacrificed much of his minimal personal time to assist his father with paperwork related to his new disabilities . . . He would regularly drive Dad to

United States v. Aaron Finn  October 19, 2022
Sentencing Submission  Page **4** of **12**

doctor's appointments and run errands"); Anita Giaimo Letter (Exhibit F) ("Several years ago, his father had a medical condition which incapacitated him. When it occurred, Aaron became the primary person to take care of his father and his mother. . . he took it upon himself to find a home, rehab it to fit his father's heel chair and provide seclusions as his mother is reclusive"); Katrina Eichler Letter (Exhibit G) ("He was dedicated to his family and more importantly his father and brother who it seemed like he felt responsible for takin care of"); Patrick Clausen Letter (Exhibit H) ("He worked endless amounts of overtime to buy a house that he could put elderly parents in while he himself stayed in a small rundown mobile home").

As demonstrated by the Letters submitted to the Court, Mr. Finn is similarly devoted to helping his friends as well as other members of his family. *See* Kirk Womack Letter (Exhibit I) ("when he isn't working at his business he is fixing someone else's car . . . probably for free"); Ryan Liebermann Letter (Exhibit J) ("When I first met Aaron it became quite clear that he is someone that you can count on and call a friend, if ever I needed help with anything he was just a phone call away, whether it was car troubles, help clearing trees and doing yard work or just needing a friend he is there within a moments notice"); Courtney Belcher Letter (Exhibit K) ("Aaron always stopped whatever he was doing to get me back on the road"); Robert Faby Letter (Exhibit L) ("I could always rely on him to assist me at work, and outside of work was no different. Aaron was just a phone call away. I remember one instance, I was doing some car work in my driveway and, and, as usual, something broke. I called Aaron, and he dropped what he was doin and was at my door within a half hour"); Katrina Eichler Letter (Exhibit M) ("My friend Finney is the type of person you want by your side, he has a son now; very new to this world and wife and he's still his parent's sole provider"); Thomas D'Ascanio Letter (Exhibit N) ("He would make sure that [my wife] was feeling ok . . . he would constantly check up on her and talk to her about the mobility aids he has researched for his parents and how they may help her"); Casey Mack Letter

(Exhibit O) ("Aaron has always been this way, going above and beyond to make people in his life happy and comfortable").

*Employment History*

After graduating high school, Mr. Finn began work at the Poughkeepsie Journal, a job he maintained for six years. PSR ¶ 52. Mr. Finn left the Poughkeepsie Journal in 2012 so that he could train to become a corrections officer. PSR ¶ 53. His motivation to work in a prison was due in part to his close relationship with his older brother, Steven. PSR ¶ 34, 51. Steven spent a good portion of his life in prison but after one period of "shock incarceration" Steven "came out completely different" and found sobriety. *Id.* Steven then taught Mr. Finn handyman skills and the two developed a close bond. PSR ¶ 51. Steven's experience with the criminal justice system, as well as Mr. Finn's desire for a career supporting law enforcement, motivated Mr. Finn to become a correction officer. PSR ¶ 51, Amanda Finn Letter (Exhibit A). PSR *Id.*

Mr. Finn found work as a correction officer at Green Haven Correctional Facility in Stormville, New York. PSR ¶ 51. Unfortunately, life as a correction officer was difficult for Mr. Finn. In 2016, Mr. Finn was disciplined for taking too much time off to help care for his father. Then, on October 28, 2019, Mr. Finn was attacked by an inmate. PSR ¶ 42. As detailed by the prison's personnel clerk in paperwork relating to this incident, Mr. Finn "was attacked, suffering multiple stab wounds to the head, neck and back, bruising knees and elbows, as well as blood exposure."

***Worker's Compensation Board Paperwork***[1]

As a result of his injuries, Mr. Finn was taken to Vassar Brothers Medical Center. Medical Records Relating to October 28, 2019 Hospitalization (Exhibit P). The hospital records explain that Mr. Finn had arrived via an ambulance because he had been "assaulted by an inmate with a pen." *Id*. P. 18 of 178. Scans of Mr. Finn's neck, head and back were performed "and fortunately both of these studies did not reveal any acute traumatic injury." *Id*. P. 65 of 178. Mr. Finn was discharged with the advice that he "follow up with both his primary care physician as well as the Vassar trauma clinic." *Id*.

The attack took a toll on Mr. Finn. His friends noticed that Mr. Finn was different. A colleague at the prison notes that "Predominately his anxiety and just overall levels of jumpiness when he returned to work were much higher." Patrick Clausen Letter (Exhibit H). *See also* Robert Faby Letter (Exhibit L) ("I was not present during the October 2019 incident in which Aaron was injured at work, but I did hear about it, from others at work and from Aaron himself. I know that when he did return, he wasn't the same.").

---

[1] This paperwork was provided by the Government and is labeled USAO_000417.

*PTSD*

Months after he was attacked, Mr. Finn was diagnosed as having PTSD. PSR ¶ 39, 44-45. This diagnosis was recently confirmed by Dr. Elliot B. Rosenbaum, a psychologist who has worked both in private practice and at the Naval Hospital in Jacksonville Florida. Dr. Rosenbaum evaluated Mr. Finn and determined that Mr. Finn has PTSD relating to the October 28, 2019 stabbing. Dr. Rosenbaum Report, P. 11-12 (Exhibit Q).

*The Offense, Remorse and Acceptance of Responsibility*

On February 12, 2022, Mr. Finn was ordered to return to work the following day. See Worker's Compensation Paperwork (Exhibit R). On March 19, 2020 – less than five months after Mr. Finn had been stabbed and 34 days after returning to work – Mr. Finn was working at Green Haven overseeing inmates as they returned from lunch. PSR ¶ 8. As the inmates returned to the dorms, one remained in the hallway. *Id.* Mr. Finn ordered him to return to his cell. *Id.* The inmate refused and instead began to use an electronic kiosk affixed to the wall. *Id.* After a verbal exchange, the inmate remained non-compliant, so Mr. Finn used pepper spray and requested help from other correction officers. *Id.* Mr. Finn then handcuffed the inmate and attempted to move him. *Id.* As Mr. Finn did this, his fingers temporarily got caught in the handcuffs. PSR ¶ 15. Mr. Finn then attacked the inmate by thrashing him against steel bars and pushing him against a cinderblock wall. PSR ¶9. The assault lasted seven seconds. PSR ¶ 10.

Mr. Finn was arrested on November 4, 2021. PSR P. 1, ¶ 12. Eight months later, Mr. Finn pleaded guilty. PSR ¶ 3. During his allocution, Mr. Finn admitted his guilt and apologized, explaining "I lost my composure and shoved his head against a metal bar on more than one occasion, using force that was far too excessive and that was unjustified and unreasonable. . . I am very sorry." *Id.* Mr. Finn has expressed similar remorse to Your Honor. In his letter to the Court, Mr. Finn explains,

> I would like to take this time to say I take full
> responsibility for my actions. . . . I never should have used
> the amount of force I did, especially on a cuffed
> individual. . . . I take full responsibility and Mr. ▇
> should never have suffered that assault by my hand.
> Aaron Finn Letter (Exhibit S).

Mr. Finn has expressed similar remorse to his family and friends. One friend, and a former corrections officer, explains, "I was present that day, though not involved in the incident. I was working in an adjacent housing unit, but I remember the radio call requesting aid to the housing block, and I remember clearly the officers who did respond making their way back to my block, refusing to say anything about it because of what had transpired. I spoke with Aaron after work that day, to make sure he was ok, and his response was that he couldn't believe what happened, and how horrible he felt for it." Robert Faby Letter (Exhibit L).

### *The Most Appropriate Sentence: Time Served*

As Your Honor is well aware, in selecting a sentence this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and rehabilitation." *Id*. In *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), the Second Circuit explained that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, **it must choose the lower sentence**. *See id*. at 142 (observing that where a guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence). In this case, and as detailed below, incarceration would result in a sentence that is "greater than necessary."

A. <u>The Nature and Circumstances of Mr. Finn's Crime Do Not Compel a Prison Sentence</u>

While Mr. Finn undeniably broke the law and his victim sustained injuries, Mr. Finn's conduct was not premediated and instead lasted over a period of roughly seven seconds. Moreover, Mr. Finn's assaultive conduct can be directly linked to the February, 2019, incident where he was the victim of an assault. As explained by Dr. Rosenbaum,

> When taking into account the relevant literature on PTSD and the available information regarding the incident, it is my opinion that the events on March 2020 likely served as a trigger for the re-experiencing/intrusive symptoms and dissociative reactions caused by the traumatic nature of the prior stabbing incident. In other words, on March 19, 2020, when Mr. Finn was presented with a seemingly similar traumatic incident, mimicking the events of the prior stabbing incident, the extreme stress and fear that he felt resulted in post-traumatic amnesia and dissociation. This response would have rendered him more vulnerable to impulse control difficulties and aggressive behavior. Dr. Rosenbaum Report (Exhibit Q).

Under these circumstances, a custodial sentence is not necessary and would amount to a sentence that is greater than necessary.

B. <u>Mr. Finn's History and Characteristics Warrant Leniency</u>

Mr. Finn's life history demonstrates that jail is not necessary. Mr. Finn has never before been in trouble and pleaded guilty promptly without filing motions. Mr. Finn has repeatedly expressed remorse, both in court and to his family and friends. PSR ¶ 15. Mr. Finn has complied with all of the terms of his supervised release and Probation has determined that he "is not viewed as . . . a danger to the community." PSR ¶ 5, P. 25.[2]

---

[2] While Mr. Finn suffers from PTSD, he is not a risk of reoffending because the condition "is related to his work as a corrections officer . . . and the unique and

Mr. Finn's background also merits leniency. He grew up poor in a home that often did not have electricity or running water. PSR ¶ 35. Nevertheless, Mr. Finn worked hard and has been consistently employed since he was a teenager. PSR ¶ 50-52.

Perhaps most significantly, Mr. Finn is devoted to his family. Unlike many who don't care for their elders, Mr. Finn is a devoted son who has repeatedly sacrificed to make sure his parents are comfortable. Mr. Finn ensures that his parents get to their medical appointments and that their basic needs are met. Vincent Giaimo Letter (Exhibit E). His wife explains that Mr. Finn does not want his parents to be homeless or in a nursing home and that, as a result, he bought a home for them to live in. Amanda Finn Letter (Exhibit A).

Mr. Finn shows similar devotion to his wife, son, extended family and friends. Kirk Womack, Mr. Finn's neighbor, explains "He is constantly going. Working. Taking care of his Parents. His wife. His newborn son ▇. His wife's family etc… when he isn't working at his business he is fixing someone else's car for them…probably for free too. People like Aaron are the small percentage that does a large percentage of keeping the world going." Kirk Womack Letter (Exhibit I). These sentiments, and those expressed by Exhibits A-O, demonstrate that Mr. Finn's character is strong and that his abhorrent conduct on March 19, 2020, conduct was a clear aberration.

C.   The Remaining Sentencing Factors Justify Leniency

Mr. Finn has been specifically deterred. Because of his conduct, he was arrested and has been under the supervision of PreTrial Services for nearly a year. Mr. Finn is extremely remorseful and is committed to ensure that his PTSD is treated so that nothing like this ever happens again. PSR ¶ 46. Under these

---

violent stimuli of corrections work are no longer part of his life." Dr. Rosenbaum Report, P. 14. (Exhibit Q).

circumstances, it is clear that Mr. Finn is not at risk of reoffending. For this reason, and because research shows that a more severe sentence does not lead to greater specific deterrence for individual defendants, a custodial sentence is unnecessary. See The Honorable Peggy Fulton Hora & Theodore Stalcup, *Drug Treatment Courts in the Twenty-First Century: The Evolution of the Revolution in Problem-Solving Courts*, 42 GA. L. REV. 717, 724 (2008). The same can be said for general deterrence. Studies have proven that more severe sentences do not result in greater general deterrence. Michael Tonry, Purposes and Functions of Sentencing, 34 CRIME AND JUSTICE REVIEW: A REVIEW OF RESEARCH 28-29 (2006) ("[I]ncreases in severity of punishment do not yield significant (if any) marginal deterrent effects. . . . Three national Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."). It is the certainty of being prosecuted rather than the severity of punishment that deters crime. See Nat'l Inst. of Just., Five Things About Deterrence, Jun. 6, 2016. The fact that Mr. Finn was arrested, prosecuted, convicted and sentenced, will provide sufficient general deterrence; a term of incarceration is not required for an individual who, like Mr. Finn, has done well on pre-trial release and has never before been incarcerated or even accused of a crime.

While the proposed sentence would avoid incarceration, a sentence involving community service and post-release supervision and potentially restitution is a significant punishment for Mr. Finn, a first-time offender who has never before been incarcerated or subjected to the criminal justice system. Due to his unlawful actions, Mr. Finn will forever be brandished a "criminal" and will face a lifetime of the "collateral" consequences relating to his conviction. This – combined with mandatory community service or restitution and supervised release – constitute sufficient punishment. *See United States v. Mateo*, 299 F. Supp.2d 201, 210 (S.D.N.Y. 2004) (beyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal convictions, to name a few: losses of family life, of socioeconomic status, of

| | |
|---|---:|
| United States v. Aaron Finn | October 19, 2022 |
| Sentencing Submission | Page **12** of **12** |

employment and career opportunities; diminution of certain civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement.).

\* \* \*

There is nothing to be gained by a prison sentence in this case, especially in light of Mr. Finn's remorse, his sympathetic past and his acceptance of responsibility. For the reasons set forth above, and especially because Mr. Finn's conduct can be directly linked to his own assault and the psychological toll it caused, I respectfully ask that the Court to impose a non-incarceratory sentence.

Thank you for your consideration.

Sincerely,

//s

Benjamin Gold
Assistant Federal Defender

cc:   AUSA Lindsey Keenan
      AUSA Charles Jacob