

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

October 26, 2022

**By ECF**
The Honorable Nelson S. Román
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

      Re:    *United States v. Aaron Finn.*, S1 21 Cr. 650 (NSR)

Dear Judge Román:

      The Government respectfully submits this letter in advance of the sentencing of defendant Aaron Finn, who pleaded guilty to depriving an inmate of his civil rights under color of law. Sentencing is scheduled for November 2, 2022, at 10:00 A.M. For the reasons explained below, the Government submits that a sentence within the stipulated Guidelines range of 24 to 30 months' imprisonment (the "Guidelines Range") would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## Background

### A. The Offense Conduct

      The defendant deprived inmate Melvin Virgil of his constitutional right to be free from cruel and unusual punishment by assaulting him and causing him to suffer serious bodily injuries.

      In March 2020, Virgil was an inmate in New York State Department of Corrections and Community Supervision's ("DOCCs") custody and housed at the Green Haven Correction Facility, located in Dutchess County, New York. (PSR ¶ 7). According to a Use of Force Staff Memorandum authored by Finn, Finn was working on the third floor of the prison's A-Block on March 19, 2020, overseeing the inmates' return from lunch. (PSR ¶ 8). According to Finn's report, Finn ordered Virgil to lock into his cell after lunch, but Virgil instead attempted to use a kiosk station that allows inmates to download correspondence to their digital tablets. (PSR ¶ 8). After further verbal exchanges, Finn sprayed Virgil with pepper spray, and requested assistance from a response team. (PSR ¶ 8). Then, Finn handcuffed Virgil and led him off the cellblock. (PSR ¶ 8).

      A different correction officer responded to the radio request for assistance. That officer turned on his body camera *en route*. (PSR ¶ 9). That body camera footage shows the following: as the responding correction officer rounds the top of the staircase on the third floor of A-Block, Virgil is face-first against the wall, pinned there by Finn. (PSR ¶ 9, Gov. Ex. A at 12:45:12). Virgil is compliant, in restraints, and not resisting. (PSR ¶ 9). Finn cocks his right arm back and uses his

Honorable Nelson S. Román   Page 2 of 9
October 26, 2022

right forearm to violently strike the back of Virgil's head.[1] (PSR ¶ 9). Finn then does it again—cocks his right arm back, and uses his forearm to violently strike the back of Virgil's neck and head, which remains pressed against the wall. (PSR ¶ 9).





---

[1] The Government has added additional notations to these screenshots in order to identify Finn and Virgil for the Court.

As recorded on Finn's body camera (which has audio), after Finn's second blow to Virgil, Virgil collapses. (PSR ¶ 9). Finn grabs Virgil's shoulder, and using this grip smashes Virgil's head against steel bars four times. (PSR ¶ 9). Dull thuds are audible each time Virgil's head hits the bars. Virgil's body is limp while his head hits the bars repeatedly.



(Finn used this hand-to-shoulder grip to smash Virgil's head four times against steel bars, while Virgil's body was limp)

The responding correction officer then instructs Finn to take it easy, and C.O. Finn says "fucker," while gripping Virgil by the shoulders. (PSR ¶¶ 9-10; Gov. Ex. B at 12:45:19). For approximately six seconds, Virgil appears entirely unconscious: he emits a "snoring"-like sound and his limp head and body fall to the ground.[2]

After the beating, another correction officer orders Virgil to stop moving his legs, and then Virgil is directed to get on his stomach. As Virgil is forcibly rolled over, his face brushes the white cinder block wall, leaving a significant trail of blood visible on the wall. Photographs of the scene similarly show significant amounts of blood on the wall and floor where Finn assaulted Virgil.

---

[2] Finn's body camera only began recording footage during the assault—as Finn was smashing Virgil's head against the steel bars.




Virgil was brought to Green Haven's medical unit, where he received numerous stitches for significant lacerations to his forehead and left eyebrow, and was treated with glue for a laceration to his cheek. (PSR ¶ 11). Specifically, as reflected in Green Haven records, Virgil suffered: (1) a 1 3/4" inch laceration to his mid forehead, which required 2 sutures to close; (2) a 1" laceration to his left eyebrow, which required two sutures to close; (3) a 2 1/4" laceration to his left eyebrow, which required eight sutures to close: and (4) a 1/3" inch laceration to his left cheek. (PSR ¶ 11).

In his Victim Impact Statement, Virgil reports that he also now suffers from severe migraines that last from one to two days. (PSR ¶ 13). Virgil articulated that these migraines are much worse and occur with much greater frequency than the headaches he had only on occasion prior to the assault. (PSR ¶ 13). Virgil states that he still has damage to a nerve in his tooth because of Finn's assault. (PSR ¶ 13). Virgil also reports that he has suffered from greater anxiety since the attack, sees a therapist once every thirty days (where he frequently discusses this incident), and now takes additional medication for his anxiety. (PSR ¶ 13). Virgil states that he now gets anxious and fearful whenever he hears handcuffs jingle, and that the assault took away his trust in the "good guys." (PSR ¶ 13).

### B. The Indictment and Guilty Plea

On or about November 4, 2021, a grand jury sitting in this District returned the S1 superseding indictment, charging Finn with a deprivation of civil rights under color of law, in violation of Title 18, United States Code, Section 242. (Dkt. No. 4). On July 12, 2022, Finn pleaded guilty to the single count in the superseding indictment before the Honorable Judith C. McCarthy, United States Magistrate Judge for the Southern District of New York. On September 2, 2022, the Court accepted Judge McCarthy's recommendation that the Court accept Finn's guilty plea and adjudge Finn guilty of the offense charged in the superseding indictment. (Dkt. No. 22).

**C. The Plea Agreement**

The plea agreement, dated June 19, 2022, provides that pursuant to U.S.S.G. § 2H1.1(a)(1) the base offense level is 10, because the offense involved the use of force against a person. The stipulated Guidelines Range described in the agreement states that, pursuant to U.S.S.G. § 2H1.1(b)(1)(B), the base level offense of 10 is increased 6 levels because the offense was committed under color of law; and another 2 levels, pursuant to U.S.S.G. § 3A1.1(b)(1), because the victim was a vulnerable victim; and another 2 levels, pursuant to U.S.S.G. § 3A1.3, because the victim was physically restrained during the course of the offense. Pursuant to U.S.S.G. § 3E1.1(a) & (b), a 3-level decrease is warranted for acceptance of responsibility and timely notice of intention to enter a plea of guilty, resulting in an adjusted offense level of 17. Because Finn is in Criminal History Category I, the agreement provides that the resulting Guidelines Range is 24 to 30 months' imprisonment.

When calculating a sentencing guidelines range, the United States Probation Office ("Probation") did not apply the two-level enhancement pursuant to U.S.S.G. § 3A1.1(b)(1) applicable to vulnerable victims. (PSR ¶¶ 17-26). Thus, Probation calculates a total offense level of 15 (PSR ¶ 26), and a criminal history category of I (PSR ¶ 29), which results in a guidelines range of 18 to 24 months' imprisonment. (PSR ¶ 57). According to Probation, "without specificity to what characteristics of the victim make the victim a vulnerable victim, Probation cannot apply this adjustment." (PSR ¶ 60). In addition, Probation asserts the application of the vulnerable victim enhancement would be "double counting," because the defendant's elevated status as a law enforcement officer and the victim's inability to defend himself due to physical restraint already are accounted for by other enhancements. (PSR ¶ 60).

**Discussion**

**A. A Sentence Within the Guidelines Range is Appropriate**

As the Court is well aware, the Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions*," Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. After that calculation, however, the Court must consider not only the Guidelines, but also the six other factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing (as set forth below); (3) "the kinds of sentences available"; (4) any relevant policy statement by the Sentencing Commission; (5) "the need to avoid unwarranted sentence disparities among defendants"; and (6) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); Gall, 552 U.S. at 50 & n.6. In determining the appropriate sentence, the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

     (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

     (B)     to afford adequate deterrence to criminal conduct;

     (C)     to protect the public from further crimes of the defendant; and

     (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

The nature and seriousness of the offense, and the need to afford adequate deterrence are significant considerations in this case, meriting a sentence within the Guidelines Range.

With respect to the nature and seriousness of the offense, the defendant's conduct is gravely serious. As described above, the defendant abused his position of authority as a correction officer by assaulting a handcuffed and compliant inmate, Melvin Virgil. Not content to handcuff Virgil and walk him off the cellblock, the defendant shoved Virgil face first against the cellblock wall. Not content to pin Virgil to the wall, the defendant used his forearm to repeatedly strike the back of Virgil's head so his face struck the cinderblocks. When Virgil fell to the ground, the defendant grabbed him and repeatedly thrashed his head against steel bars. When another correction officer moved to intervene, the defendant cursed at Virgil, making plain his anger, and his disdain for the person in his care. As a result of the defendant's conduct, Virgil suffered serious injuries, and continues to feel the effects of those injuries. Apart from the significant physical harm inflicted on Virgil, the general societal harm caused by this conduct cannot be understated. Random violence inflicted on inmates entrusted to the care and custody of the state undermines trust and confidence in the ability of the legal system to punish crime and rehabilitate offenders. The erosion of trust and confidence in public systems is a harm the Court can and should take into consideration when imposing sentence.

In addition, the need for general deterrence counsels strongly toward a sentence within the Guidelines Range. Here, the defendant's conduct happens to have been captured on video. The Court can see and hear the brutality of the assault on Virgil. But much of what occurs in prison occurs behind high walls, without cameras, out of view to the Court and the public. A sentence within the Guidelines Range will send a message that abusive conduct will not be tolerated, and when found out, will be appropriately punished. *See*, *e.g.*, *United States v. McQueen*, 727 F.3d 1144, 1158 (11th Cir. 2013) ("The need for the criminal law to deter seems especially compelling here. Prison inmates serve their sentences under the pervasive control of the corrections staff."); *see also Maryland v. Shatzer*, 559 U.S. 98, 127 (2010) ("Prisoners are uniquely vulnerable to officials who control every aspect of their lives[.]") (Stevens, J., concurring); *see generally United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

Honorable Nelson S. Román  
October 26, 2022
Page 7 of 9

### B. The Vulnerable Victim Enhancement is Appropriate

In calculating the relevant offense level, Probation declined to apply the vulnerable victim enhancement prescribed by U.S.S.G. § 3A1.1(b)(1). In Probation's view, the enhancement would "double count" conduct already accounted for by the color of law and restraint enhancements prescribed by U.S.S.G. §§ 2H1.1(b)(1)(B), and 3A1.3. In *United States v. Hershkowitz,* 968 F.2d 1503 (2d Cir. 1992), the Second Circuit considered and rejected a similar argument, finding:

> [Defendant] contends that the district court erred in applying U.S.S.G. § 3A1.1 since the vulnerability of the detainee was merely a result of [Defendant's] status as a guard, a factor already accounted for in the U.S.S.G. § 2H1.4 calculation applicable to a violation of civil rights under color of law. . . Defendant misconstrues the source of [the victim's] vulnerability. The basis for concluding that he was particularly susceptible to [Defendant's] criminal conduct was his status as a prisoner in a detention facility, in the custody of, and surrounded by, four guards when the assault occurred. These considerations are distinct from and in addition to the fact that defendant's actions were taken under color of law. . .
>
> In other words, that a defendant is acting under color of law does not necessarily contemplate a victim who is in custody and under defendant's control. Nor does acting under color of law presuppose that the victim will be surrounded by defendant's fellow law enforcement officers, whose presence increases the coercive nature of the encounter. These are the factors the district court found, correctly we believe, rendered [the victim] unusually vulnerable to [Defendant's] attack under U.S.S.G. § 3A1.1.

*Hershkowitz,* 968 F.2d at 1505; *see also United States v. Volpe*, 224 F.3d 72, 77 (2d Cir. 2000) ("even if every assault on an individual in custody were committed by an officer of the state, which we doubt, the Guidelines would still permit the imposition of both the in-custody and color-of-law adjustments in order to recognize the separate harms caused by each of these aggravating factors").

In other words, the "color of law" enhancement does not presuppose an incarcerated victim; it would be equally applicable to an interaction between a police officer and a citizen on the street (among other hypothetical scenarios). As in *Hershkowitz*, the victim here was "particularly susceptible to criminal conduct"—he was an inmate in a prison where the correction officers were charged with protecting his well-being and safety, and constantly in the presence of such officers, including when Finn assaulted him.

Likewise, the enhancement for physical restraint under Section 3A1.3 is appropriate because it protects a source of vulnerability that is distinct from the "color of law" enhancement. Section 3A1.3 provides, "[i]f a victim was physically restrained in the course of the offense, increase by 2 levels." "Physically restrained" means "the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § 1B1.1, Application Note 1(h). A court should not apply

the § 3A1.3 adjustment "where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself . . . " U.S.S.G. § 3A1.3, Application Note 2. Here, the defendant handcuffed Virgil before assaulting him, rendering him even more helpless. Neither the color of law nor the vulnerable victim enhancement incorporates the physical restraint of a victim. Instead, there are many scenarios, even within prison walls, even with a correction-officer assailant, in which a victim would not be physically restrained. *See United States v. Volpe,* 78 F. Supp. 2d 76, 85 (E.D.N.Y. 1999) ("Section 3A1.3 requires a two-point upward adjustment if the victim was restrained in the course of the offense. Because this is a 'victim-related adjustment,' it is largely irrelevant who restrained [Abner] Louima and for what purpose. What matters is that Volpe repeatedly assaulted a shackled and vulnerable man." (citing *United States v. Clayton*, 172 F.3d 347, 353 (5th Cir. 1999) ("lawful restraint of victim by police is 'aggravating factor that intensifies the wilfulness, the inexcusableness and reprehensibleness of the crime.'")).

### C. The Defendant's Arguments are Not Persuasive

With respect to the defendant's caring conduct toward his family or friends, it is regrettable that the defendant's incarceration will negatively impact his dependents. However, the same is true of many defendants, and Section 3553(a) properly focuses the Court's attention in imposing sentence on the defendant and on the offense of conviction, not the impact of incarceration on others. *See*, *e.g.*, *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration."); *see also Koon v. United States*, 518 U.S. 81, 95 (1996) ("the defendant's family ties and responsibilities" are a "discouraged" basis for a departure (citing U.S.S.G. § 5H1.6)). With respect to the defendant's arguments regarding his lack of criminal history or that his conviction is an "aberration," this fact is already accounted for in the Guidelines Range. And, in view of the fact that correction officers are generally subjected to pre-employment background screening, it is unsurprising that a correction officer does not have a meaningful criminal history. Finally, with respect to the defendant's previous experiences at Green Haven, and post-traumatic stress disorder, the Court should of course consider the defendant's mental health when imposing a sentence. However, for the reasons set forth above, the Government respectfully submits a sentence within the Guidelines Range is appropriate.

**D. Conclusion**

The criminal civil rights laws are intended to protect vulnerable citizens from the willful actions of those in authority who abuse their power. A significant sentence, in line with the Guidelines Range in this case, is necessary to impress the seriousness of the offense upon those who would follow the defendant's lead. For the forgoing reasons, the Court should impose a sentence within the Guidelines Range of 24 to 30 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: _____
Lindsey Keenan / Charles Jacob
Assistant United States Attorneys
(212) 637-1565 / 2725

cc: Benjamin Gold, Esq. (by ECF)